Rel: April 21, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

———————————————

### SC-2022-0765

———————————————

## Lafayette Land Acquisitions II, LLC

v.

## Steven L. Walls

### Appeal from Baldwin Circuit Court
### (CV-21-900417)

MITCHELL, Justice.

Whenever possible, we interpret a written contract based on the language contained within the four corners of the document. Here, a

purchase agreement provided that the parties were obligated to close a real-estate sale unless the buyer -- Lafayette Land Acquisitions II, LLC ("Lafayette Land") -- rejected the deal in writing before the end of the due-diligence period. Although the parties dispute when that period began, and how long it lasted, it is undisputed that Lafayette Land never rejected the deal. Therefore, the parties are obligated to close. Because the Baldwin Circuit Court held otherwise, we reverse and remand.

Facts and Procedural History

Lafayette Land offered to buy Steven L. Walls's property in Orange Beach. Walls accepted the offer, and the parties entered into a purchase agreement that became effective on February 26, 2021. The purchase agreement provided, in part, that "Seller will provide and Buyer will accept an existing survey or plat." It set a closing date of April 26, 2021, and stated that "[t]ime is of the essence."

Two addenda -- Addendum #1 and Addendum #2 -- followed the purchase agreement. Only Robert Isakson, Sr., the owner and manager of Lafayette Land, accepted Addendum #1. Addendum #1 contained Walls's signature at the bottom, but he did not check the "accepted" box associated with the signature line. Instead, he checked the "countered"

box and indicated that a counter-addendum was attached as "Addendum #2."

Addendum #2, which both parties signed and accepted, contains two clauses that lie at the heart of this dispute. The first clause defines the length of the due-diligence period, stating: "Buyer shall have a period of sixty (60) days subsequent [to] the date in which Buyer is in receipt of Seller's Due Diligence materials ('Due Diligence Period') to determine whether or not to purchase the 'Property.'" The second clause contains key language on the role of silence during the due-diligence period:

> "If Buyer does not give written notice to Seller of its election to not purchase the property prior to the expiration of the Due Diligence Period, then it is agreed that the Buyer shall be deemed to have approved the Property and the parties shall proceed to Closing subject to the provisions set forth herein."

The second clause further states that "Seller agrees to provide one 30-day extension to the Due Diligence Period to extend the closing for the deposit of the sum of $5,000 paid directly to Seller."

In the months that followed, the parties engaged in an extended back-and-forth about whether each party was meeting the requirements of the purchase agreement. First, they disagreed about whether Walls had provided documents that Lafayette Land said that it had requested.

Next, the parties disagreed about when the due-diligence period had begun and ended. Finally, after Walls received multiple additional offers for the property, including one that was $100,000 more than what Lafayette Land had agreed to pay, Walls asked Lafayette Land to sign an agreement releasing both parties from the deal. Lafayette Land refused and proposed an amendment that would maintain the closing date set out in the purchase agreement. Walls did not agree and insisted that Lafayette Land sign the release. Sue Ginter, Walls's real-estate agent, summarized the selling side's unwillingness to close the deal when she told Isakson's paralegal that "[w]e all need to move on."

But Lafayette Land wanted to close. In an effort to protect its rights, Lafayette Land filed a complaint in the Baldwin Circuit Court several days before the closing date. In the complaint, it asked for a judgment declaring that the purchase agreement was "valid and binding." Lafayette Land also filed a notice of lis pendens in the Baldwin Probate Court referencing the declaratory-judgment action and noting that it was seeking a court order requiring Walls to convey the property. Walls represented himself in the declaratory-judgment action and filed an answer in which he asked the circuit court to declare the purchase

4

agreement void. After conducting a bench trial, the circuit court entered a declaratory judgment in favor of Lafayette Land. Walls then obtained counsel and filed a motion to alter, amend, or vacate the judgment, which the circuit court granted.

The circuit court conducted a second bench trial, at which it heard testimony from Isakson, Walls, and Ginter. During the trial, Isakson testified that he never rejected the deal in writing. Neither Walls nor Ginter refuted that testimony. At the conclusion of the trial, the circuit court issued a final judgment in favor of Walls. In doing so, it made three factual findings. First, it determined that "the Purchase Agreement that was entered into between the parties ... expired … and the Court finds that [Lafayette Land] failed to exercise it's [sic] option to extend the due diligence period of 30 days." Second, it reasoned that "no due diligence materials were specified in the contract, therefore no due diligence materials were due from [Walls] to [Lafayette Land]." Finally, it found that Lafayette Land had received either a survey or a plat from Walls as provided in the purchase agreement. It concluded by stating that "[t]here are no remaining duties owed [Lafayette Land] or [Walls] under the

5

Purchase Agreement."  After the circuit court issued its judgment, Lafayette Land appealed.

Standard of Review

When a trial court hears ore tenus testimony, "'its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.'" Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005) (citation omitted).  But "'the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts.'" Id. (citation omitted).  Further, "[i]f a contract can be interpreted without going beyond the four corners of the document, the trial court's resolution of the question of law is accorded no presumption of correctness, and this Court's review is de novo." Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res., 986 So. 2d 1093, 1101 (Ala. 2007).

Analysis

Lafayette Land makes one dispositive argument on appeal -- that the circuit court erred by failing to give effect to the provision in Addendum #2 that directed the parties to close if Lafayette Land did not

provide a written rejection before the due-diligence period ended. We agree with that argument.

When the language of a written agreement is unambiguous, we confine our review to the four corners of the document. See Kershaw v. Kershaw, 848 So. 2d 942, 955 (Ala. 2022). Language is unambiguous when it leads to only one reasonable interpretation. Ex parte Warren Averett Cos., [Ms. 1210010, June 17, 2022] __ So. 3d __ (Ala. 2022). And in that instance, we must accept that language for what it says and may not "twist the plain meaning of the terms in a contract to create an ambiguity under the guise of interpretation." Southland Quality Homes, Inc. v. Williams, 781 So. 2d 949, 953 (Ala. 2000).

Here, the relevant language in Addendum #2 is unambiguous. It states: "If Buyer does not give written notice to Seller of its election to not purchase the property prior to the expiration of the Due Diligence Period, then it is agreed that the Buyer shall be deemed to have approved the Property ...." If no written rejection occurs, "the parties shall proceed to Closing subject to the provisions set forth herein." We agree with the circuit court's determination that the due-diligence period has ended. Thus, all that had to be determined was whether Lafayette Land had

7

provided written notice to Walls before the due-diligence period ended that it elected not to purchase the property.

A review of the record shows that Lafayette Land never provided any written rejection to Walls. The communications before Lafayette Land filed suit reflect a continuous effort by Isakson to obtain more information about the property to determine whether to continue with the transaction; but there is no indication that Isakson, or any representative of Lafayette Land, ever rejected the deal. On the contrary, Isakson gave unrebutted testimony during the trial that he never rejected the property as unsatisfactory. Walls neither cross-examined Isakson on this point nor presented any evidence of his own indicating that Isakson had rejected the deal. And, once Walls demonstrated an unwillingness to fulfill his obligations under the purchase agreement, Lafayette Land commenced this action, which further demonstrates its good-faith intent to close. Because we agree with the circuit court's finding that the due-diligence period ended, the parties were obligated to close the deal.

Walls makes two arguments in an effort to avoid closing. First, he points to a provision in the purchase agreement that addresses his

8

options in the event Lafayette Land defaulted on the agreement. One of those options gave Walls the "right to terminate this Agreement." But Walls does not point to any facts or offer any sort of argument demonstrating that Lafayette Land ever defaulted on the purchase agreement. So his first argument fails.

Second, Walls contends that Lafayette Land waived the dispositive issue outlined above by failing to cite proper authority. But Lafayette Land cited our cases stating the longstanding rule that we give effect to the plain language of written agreements. See, e.g., Shoney's, LLC v. MAC East, LLC, 27 So. 3d 1216, 1223 (Ala. 2009) ("[W]e maintain our long-held position that a contract, under Alabama law, should be construed as written."); Reeves Cedarhurst Dev. Corp. v. First AmFed Corp., 607 So. 2d 184, 186 (Ala. 1992) ("In interpreting a contract, the '"words of the agreement will be given their ordinary meaning."'" (citations omitted)). And it pointed us to the operative language of Addendum #2, which states that the parties "shall proceed to Closing." Accordingly, Walls's second argument fails as well.

Conclusion

Because Lafayette Land never rejected the deal to purchase the property in writing and was willing to close on the date specified in the purchase agreement, the parties are obligated to close. The circuit court erred when it concluded that the purchase agreement had "expired" and that, as a result, neither party owed a duty to the other. We therefore reverse and remand.

REVERSED AND REMANDED.

Parker, C.J., and Mendheim, Stewart, and Cook, JJ., concur.

Shaw, J., concurs in the result, with opinion, which Wise and Bryan, JJ., join.

Sellers, J., concurs in the result, without opinion.

SHAW, Justice (concurring in the result).

I concur in the result. The "due-diligence period" referenced in Addendum #2 to the purchase agreement must begin before the language of that provision controls the outcome of this case. If it began, there was no written notice of a refusal to purchase the property, as the main opinion notes. But, if the period did not begin, which the parties dispute in this appeal, the provision providing for written notice of a refusal to purchase did not apply. Nevertheless, there was still no refusal of the purchase of the property preventing the transaction's closing.

Further, I see nothing supporting the trial court's separate holding that the purchase agreement "expired" because of a purported lapse of the due-diligence period. Addendum #2 indicates that a failure to refuse to purchase of the property, in writing, during the due-diligence period amounted to an acceptance of the sale and that the parties would proceed to the transaction's closing. As noted above, no refusal took place.

Wise and Bryan, JJ., concur.